# Richmond.

## VIRGINIA IRON, COAL AND COKE CO. v. HUGHES' ADMINISTRATOR.

### March 16, 1916.

1. NEGLIGENCE—*Presumptions—Evidence—Burden of Proof.*—An inference cannot be drawn from a presumption, but must be founded upon some fact legally established. When liability depends upon carelessness or fault of a person or his agent, the right of recovery depends upon the same being shown by competent evidence; and it is incumbent upon the plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be ascertained by the jury—and not be left to conjecture, guess, or random judgment, upon mere supposition.

2. NEGLIGENCE—*When a Question of Fact—When of Law.*—What constitutes ordinary care or diligence in a given case in a question of fact to be determined by the jury in view of the surrounding circumstances when there is substantial evidence upon which to submit such an issue, but in the absence of such evidence it is a question of law to be determined by the court.

3. NEGLIGENCE—*Unanticipated Results.*—It is not negligence to fail to take precautionary measures to prevent an injury which, if taken, would have prevented it, when the injury could not reasonably have been anticipated, and would not have happened but for the occurrence of exceptional circumstances.

4. NEGLIGENCE—*Unusual Dangers—Warning—Proximate Cause.*—It is not sufficient to say that a man was not instructed as to unusual dangers without proving what the unusual dangers were in a particular case, and without showing that one or more of these unusual dangers were the real and proximate cause of the accident complained of.

5. MINES AND MINERALS—*Mining Act—Inexperienced Employee—Infants—Master and Servant.*—A bright, intelligent, careful boy of fifteen and a half years of age who has been working for six months as brakeman and was shown to be a good brakeman and thoroughly understood the business, and also understood the work of a flagman, which was not more difficult· or dangerous, and that he

performed the duties of each as well as an adult could have performed them, cannot be said to be an inexperienced brakeman or flagman within the meaning of the mining act.

6. Negligence — *Dangerous Machinery — Infants — Employment — Appreciation of Dangers.*—There is no rule forbidding the employment of a minor about dangerous machinery. All the law requires is that the minor should be properly instructed as to the danger to which he is exposed. If he is familiar with the machine, and its character and operations are obvious, and he is aware of and fully appreciates the dangers to be apprehended from operating it, the fact that he is a minor does not alter the general rule that the employee takes upon himself the risks which are patent and incident to the employment.

7. Master and Servant—*Injury to Servant—Negligence.*—The master is not an insurer of the safety of his servants, and can only be held liable in damages for an injury to an employee where the negligence of the master is averred as the basis of the action and is established by the evidence.

8. Negligence—*Proof Required.*—In an action to recover damages for an injury alleged to have been caused by the carelessness or fault of the defendant or his agent, it is incumbent upon the plaintiff, even upon a demurrer to the evidence, to furnish evidence to show how and why the accident occurred, that is, some fact or facts by which it can be determined by the jury and not left to conjecture, guess, or random judgment, upon mere supposition.

9. Negligence—*Unexplained Accident.*—The evidence and inferences which might have been drawn from it by a jury in the case at bar for which the defendant could not either in law or justice be held are wholly insufficient to have warranted the jury in finding that the defendant was guilty of negligence, and that such negligence caused the death of the plaintiff's intestate without fault on his part. The evidence proved nothing more than that the occurrence resulting in the death of the plaintiff's intestate was an accident which is wholly unaccounted for or explained by the evidence, and for which the defendant could not either in law or justice be held responsible.

10. Pleading—*Enlarging Scope—Improper Evidence Received Without Objection.*—Improper evidence received without objection cannot be taken to enlarge the scope of the pleadings in a case where such evidence has no bearing upon the facts at issue on the pleadings.

11. Mining Act—*Special Rules—Ordinary Details of Business.*—The provisions of the mining act requiring the operator of every mine to adopt special rules for the government of the mine, covering all work pertaining thereto, in or outside of the same, was not intended to require the adoption of rules in reference to everything done

inside and outside of the mine relating to the ordinary details of the business and employment, involving work of a simple character and well understood by those engaged in the mine.

Error to a judgment of the Circuit Court of Wise county in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. D. Hull, Jr., F. A. Groseclose, Bullitt & Chalkley* and *Jackson & Henson,* for the plaintiff in error.

*Wm. H. Werth* and *Bond & Bruce,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

This action was brought by T. J. Hughes, as the administrator of his deceased son, William W. Hughes, to recover of the defendant company, a coal mining corporation, damages for the death of plaintiff's intestate, alleged to have been caused by the negligence of the defendant. There was a demurrer by the defendant to the evidence which was overruled, and judgment rendered in favor of the plaintiff for $7,000, the damages assessed by the jury, subject to the ruling of the court upon the demurrer to the evidence, to which judgment this writ of error was awarded.

In the petition for the writ of error complaint is made that the circuit court erred in overruling the defendant's demurrer to the declaration and amended declaration filed by the plaintiff in the cause, but in the oral argument of the case here this ruling of the circuit court was, by counsel, waived, and therefore does not require further consideration.

Plaintiff's intestate, at the time he lost his life in the mine of the defendant, May 30, 1914, was fifteen years and seven

months old.  He had been working in the mines of the defend-
ant as a trapper boy and in other capacities for some. time,
certainly for a year or more.  He had been working off and on
as flagman on a motor, used in carrying in and bringing
out coal cars from the mines, for six months or more, and pretty
constantly for a month and a half or two months before the
accident to him, though for several weeks immediately before
he had been working as a car coupler.  It appears that as a
rule the motors are run by two men—that is, a motorman and
one brakeman, but as the work on the entry where plaintiff's
intestate was injured had become too heavy to be done by one
brakeman, though not heavy enough to require two men to
work as brakemen thereon, the defendant put plaintiff's intes-
tate on to assist the regular brakeman.  The decedent was
called a flagman; that is, it was his duty to ride the "trips"
of cars carried in and brought out of the mines for the purpose
of flagging the motorman in case the "trip" should break
loose, and also to flag against motors which might be approach-
ing from the rear.  It was likewise his duty to assist in shift-
ing cars, etc., and at the time of the accident to him the motor
was being run by one John Cochran, as motorman, a man by
the name of Jim Gibson, as brakeman, and deceased, as flagman.
This crew took some empties into the mine, and their purpose
was to pull two loaded cars out of the mine.  The two loaded
cars, which they wished to pull out, were sitting on a cross
entry, or motor track, just to the left of a switch leading into
a room—No. 16—called "loaded track."  In order to get these
two loaded cars out and leave the empties in the mine, it was
necessary for the motor, when it reached the two loaded cars,
to uncouple from the empty cars and push the two loaded cars
into room No. 16 "in the clear," then drop the empty cars by
gravity down to the right of the switch point, and leave them
on the motor track to the right of the switch point, and then
pull out the loaded cars.  The motorman (Cochran) did
uncouple from the empty cars and then pushed the two loaded

cars on to the "loaded track" in room No. 16, just far enough to clear the motor track, and directed Hughes (plaintiff's intestate) to release the brakes on the empty cars and drop them down to the right of the switch point. The deceased did this and then threw the switch to enable the motor, with the two loaded cars, to come on out to the motor track, and then he crossed over to the right-hand side of the track as it goes out of the mine, to a point near the switch point, his purpose being, as it appears to catch the "trip"—that is, the motor and the two loaded cars—as they went out, and ride on out to the drift mouth. After the empty cars had been dropped down to the right of the switch, Cochran, the motorman, started out with the motor and the two loaded cars, going at a speed of about two miles an hour, "or about as fast as a man can walk." Deceased, according to Cochran's statement in his testimony as a witness for the plaintiff, and which is the only statement on the subject, was standing on the right-hand side of the track somewhere near the switch, the exact point at which he was standing not being given, but from the other facts and circumstances, appearing from the evidence, it would seem that he was standing a few feet to the right of, or further in the mine, than the switch point. As Cochran at the time was engaged in back poling and had to give attention to holding the trolley pole on the wire, he did not see deceased when he undertook to get on the "trip." It was necessary to back pole until the motor got out on the motor track, but after getting out on the motor track the motorman would then turn the trolley pole and go out with the pole trailing. Cochran was on the front of the motor as it was going out and speaking of what transpired about the time he passed the switch point his statement is: "I just glanced back and saw his (deceased) light and I thought he was all right. I never looked back any more. . . . Yes, I saw his light about middle ways of the motor, I might say about middle ways of the rear bumper." He further says that he then paid no further attention to

deceased until he had run about nine hundred feet and stopped for the purpose of coupling up some cars which were at that point; that he then missed deceased and went back to look for him and found him about forty-six feet from the switch point, apparently having been dragged from the switch point; that he was not then dead but very badly mangled, having evidently been run over by the cars following the motor, and died the following night. Gibson, the brakeman at work with deceased on the trip of cars, being brought out of the mine at the time, was not examined as a witness in this case and, therefore, Cochran is the only witness who undertook to give the details of how the accident happened. In fact, as it appears, he was the only one who knew anything about it.

The plaintiff's declaration, as amended, avers four grounds of negligence as entitling him to recover damages of the defendant in this action: (1) That the defendant was guilty of negligence in maintaining a defective switch at or near the point where the accident complained of occurred; (2) Running its cars which inflicted the injury upon the plaintiff's intestate at a rapid rate of speed; (3) Not putting the deceased to work under a mine foreman or assistant, or some other experienced worker until he had opportunity to become familiar with the ordinary dangers incident to the work; and (4) Because defendant owed deceased the duty to warn and instruct him as to any unusual or extraordinary dangers incident to the work, and the defendant failed to perform this duty.

The first ground of the defendant's demurrer to the evidence relied on is: "The evidence does not show that the defendant was guilty of any negligence which was the proximate cause of the accident complained of."

As observed, the first, and in fact the main charge in the declaration is that the defendant was guilty of negligence in maintaining a defective switch at or near where the accident occurred; and it is specified that some of the bolts were out of the flange holding the switch point at the point rail, and

also that the lever which was used to throw the switch was not
in proper working condition, and that the switch point on this
account did not close up against the track, but left an opening
between the switch point and the track, which closed and
opened as the cars ran over the same, and that the foot of the
plaintiff's intestate was caught in this switch point as he
attempted to board the cars by reason of the defective condition
of the switch point. The point of plaintiff's contention in this
connection is that the deceased, in trying to get on the motor,
stepped in between the switch point and the right-hand rail
of the main track, and that the car following the motor, when
it ran on to the switch point, closed the switch against his foot
and held it fast until he was run over by the car following the
motor.

The evidence as to the condition and operation of the switch
is given by L. L. Plummer, the first witness examined for the
plaintiff, and the substance of his statement is that the switch
was defective in that after it was thrown for the purpose of
letting cars in room 16, the point of the switch would some-
times spread away from the right-hand rail of the motor track—
that is, the right-hand rail as the track runs out of the mine—
and this would sometimes cause cars to take the wrong
track—that is, would sometimes "split the switch," as it is
called. There was no difficulty, as it appears from the witness'
statement, with cars coming out of the mine, either on the
motor track, or coming out from room 16, but when they under-
took to push cars into room 16, owing to the fact that this
switch point would spring away from the main track, they had
to take care to see that they did not "split the switch." Asked
as to how much space would be left between the point rail and
the rail with which it connected, when the switch point flew
back, the witness answered that he did not know how much it
would be.

"Q. In your judgment and opinion? A. It might be just
the thickness of the flange of the wheel that passed over the

switch, and it might fly further. I could not tell you. It might be an inch, or it might be three-quarters of an inch, might be just the thickness of the flange of the wheel.

"Q. . . . From the condition of this switch, would that fly back, if so, how far? A. I can't tell; it might fly back an inch or it might fly back a quarter of an inch, or it might go further. It depends on the pressure, how hard it is hit against the rail. If the "trip" went over it fast, give it some spring, it would fly back further; the slower they go over the track, the less it would fly back.

"Q. Would it actually fly back some? A. Pretty liable to fly back whatever lost motion there was. The switch didn't fit perfectly, some lost motion."

When asked further for his opinion the witness said that when the switch rail "flew back" it would come back "some-times like two inches."

According to the only evidence in the case, the trip of cars on which plaintiff's intestate was at work at the time of the accident to him was proceeding over the switch in question very slowly, moving at a speed not exceeding two miles an hour, so that if any separation of the switch point from the main rail of the track, as indicated by the witness, Plummer, took place at all when the cars were moved over the switch, it could only have been very slight, certainly not sufficient for the decedent to have gotten his foot between the switch point and the rail. But conceding for the sake of argument that the switch point opened, and that the separation that took place was the maximum width possible, according to the evidence in the case, to-wit, two inches, the question remains whether or not a jury might have reasonably and fairly inferred from all the evidence in the case that the accident to the deceased was occasioned by his foot being caught and hung in the switch, without fault on his part. Beyond the fact that the accident occurred about or near the switch, and the testimony of the witness, Plummer, as to what he found or saw when he examined the place where

the accident happened immediately afterwards, there is nothing in the evidence, from which the jury might have reasonably and fairly inferred that the proximate cause of the accident was the defective condition of the switch, by reason of which the deceased's foot was caught and hung therein, resulting in the cars following the motor running over him and inflicting the injuries from which he died. The only facts testified to by Plummer in this connection are that he found a piece of shoe lying near the track and near the switch point, tending to show that the accident must have happened at or about the switch point, but he testifies to no other fact from which it might be reasonably inferred that decedent's foot was caught between the switch point and the track. Cochran, the motorman, as we have seen, testified that after the "trip" had started out of the mine, he looked back and saw decedent on the motor. "He was not very near the rail. It appeared to me that he was on the motor safe." If decedent had gotten on the motor and in a place of safety when the motor was about on the switch and moving at a very slow speed, as testified to by Cochran, and there is no evidence to the contrary, it is beyond comprehension how he could have gotten his foot caught in the switch. But if this statement by Cochran could be disregarded, the other proof in the case clearly shows that deceased in attempting to mount the "trip," as it was customary for him to do while the "trip" was in motion, would have had to get in between the cars or between the cars and the motor and attempt to run along in the direction they were going in order to make it possible for him to hang his foot in the switch. Not only so, but it is equally as clear from the evidence that the motor and the sides of the cars extended over the track a distance of ten or twelve inches, which would have rendered it impossible for deceased to have gotten his foot hung in the switch in attempting to mount the cars. Other physical facts testified to by plaintiff's witnesses are also strongly against his contention that his intestate hung his foot in the switch. So that there are no facts legally established by

the proof from which the inference could have been reasonably drawn by the jury that the accident to decedent happened in that way. That the switch separated at all is a matter of pure speculation and conjecture in the case, and that it separated wide enough for deceased to have gotten his foot hung therein is also left still more, if possible, to speculation and conjecture.

"An inference cannot be drawn from a presumption, but must be founded upon some fact legally established. The court has repeatedly held that when liability depends upon carelessness or fault of a person, or his agents, the right of recovery depends upon the same being shown by competent evidence; and it is incumbent upon such plaintiff to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury—and not be left to conjecture, guess or random judgment, upon mere supposition without a single known fact." *C. & O. Ry. Co.* v. *Heath,* 103 Va. 64, 48 S. E. 508, and authorities cited.

In *Hick's Admr.* v. *Romaine,* 116 Va. 401, 82 S. E. 71, the opinion of the court, in dealing with a demurrer to evidence, says: "While the party demurring thereto is considered as admitting the truth of his adversary's evidence, and all just inference which can be properly drawn therefrom by the jury, he does not admit any forced or illogical deductions from the testimony."

Admit, further, however, for the sake of argument, that the switch point in question in this case opened from a half-inch to two inches, as contended for by plaintiff, and that the deceased's foot got caught in it and caused the injury to him, was the existence of this possible gap between the rail and the switch point actionable negligence on the part of the defendant? In other words, did the defendant know, or could it have known by the exercise of ordinary care of this defective condition of the switch and provided against the happening of the accident to the deceased? There is no evidence proving or tending to prove that it knew, or by the exercise of ordinary

care could have known of such defective condition of the switch. What constitutes ordinary care or diligence in a given case is a question of fact to be determined by the jury in view of the surrounding circumstances, when there is substantial evidence upon which to submit such an issue; but in the absence of such evidence it becomes a question of law to be determined by the court.

"It is not negligence to fail to take precautionary measures to prevent an injury, which if taken would have prevented it, when the injury could not reasonably have been anticipated, and would not have happened but for the occurrence of exceptional circumstances. . . . The first requisite of proximate cause is the doing or omitting to do an act which a person of ordinary prudence could foresee might naturally or probably produce the injury, and the second requisite is that it did produce it." *Va. I. C. & C. Co.* v. *Kiser, Admr.,* 105 Va. 704, 54 S. E. 889, and authorities cited; *N. & W. Ry. Co.* v. *McDonald's Admx.,* 106 Va. 207, 55 S. E. 554; *Recker* v. *Southern Ry. Co.,* 115 Va. 201, 78 S. E. 580.

In the case at bar the evidence is wholly insufficient to sustain the contention of the plaintiff that the injury to his decedent was due to the negligence of the defendant with respect to the switch alleged to have been defective and to have been the proximate cause of the injury.

The second contention of the plaintiff that the injury to his intestate was due to the negligence of the defendant in running at a dangerous rate of speed the trip of cars upon which the deceased was at work at the time of the accident to him is also without merit—in fact, there is no proof whatever in the record to support such contention, but conclusive proof to the contrary.

The next ground of negligence upon which the plaintiff relies for a recovery in the case and which requires our consideration, is that the deceased was not put to work under the direction of a mine foreman or assistant, or some other experienced workman, until he had an opportunity to become familiar with the

ordinary danger incident to the work;. and that the defendant owed the deceased the duty to warn and instruct him as to any unusual or extraordinary dangers incident to the work, which duty the defendant failed to perform. In other words, the contention is that the defendant is liable for the injury and death of plaintiff's intestate because he was not protected by rules, instructions or orders—that is, the defendant was guilty of actionable negligence in not complying with the provisions of the mining act (Acts 1912, p. 434), in that defendant's foreman failed to give deceased instructions and warning of the "unusual or extraordinary danger" to which he was exposed, which was "known or ought to have been foreseen by the foreman," even though the deceased might have also known of the dangers attending the work he was assigned to do.

The first paragraph of section 6 of the mining act, *supra,* does provide that 'it shall be the duty of the mine foreman, or assistant foreman, of every coal mine in the State to see that every person employed to work in such mine shall, before beginning work therein, be instructed as to any unusual or extraordinary danger incident to his work in such mine which may be known to or could reasonably be foreseen by the mine foreman or assistant mine foreman . . . ;" and the second paragraph of said section provides: "Every inexperienced person so employed shall work under the direction of the mine foreman or his assistant, or some other experienced worker as may be designated by the mine foreman or assistant, until he has had reasonable opportunity to become familiar with the ordinary danger incident to his work."

With respect to the duty of the mine owner required by the first paragraph of section 6 of the act quoted, the evidence plainly shows that if the work of a flagman, which the plaintiff's intestate was performing at the time of the accident to him, was "unusually dangerous," such danger consisted in getting on, or attempting to get on, the motor while in motion, instead of getting on the rear of the "trip;" and it clearly

appears from the evidence also that the deceased was instructed as to this matter; Cochran, the motorman and plaintiff's witness, testifying that he told deceased a number of times to always catch the rear of the "trip;" so that if the attempt to catch the "trip" at some other point than its rear while the "trip" was moving at only two miles an hour, not as fast as a man can walk, was an "unusual or extraordinary danger", deceased was given all the instructions necessary concerning it. It is not sufficient to say that a man was not instructed as to unusual dangers without proving what the unusual dangers were in a particular case, and without showing, as in this case, that one or more of those unusual dangers were the real and proximate cause of the accident complained of.

That the second paragraph of the mining act, *supra,* was complied with on the part of the defendant is shown by the evidence for the plaintiff to the effect that the motorman, Cochran, was an experienced man, and that the deceased was working under him. Not only so, but the evidence shows further that deceased had been working for about six months as brakeman, was a good brakeman, and thoroughly understood the business of a brakeman, and also fully understood the work of a flagman, not more difficult or dangerous than that of a brakeman, so that he was not an inexperienced brakeman or flagman at the time of the accident to him, nor had he been put to work under an inexperienced man.

With respect to the contention made in the argument of the learned counsel for the plaintiff that the defendant was negligent, as a matter of law, in employing a boy of the deceased's age to work in the mines as a brakeman or flagman, it need only to be observed that there is no such charge of negligence made in the declaration, and that, even if it had been, the evidence not only fails to sustain such a charge, but affirmatively shows that the deceased was a bright, intelligent boy, a careful boy, and that he performed his duties as brakeman or flagman as well as an adult could. have performed them, except that he was not strong enough to do heavy lifting.

There was, of course, some danger connected with the service that deceased was employed to perform, and was performing at the time of the accident to him, and this would have been true whether the one performing it was an adult or a minor; but this, as the authorities hold, constituted no reason why he should not have been employed by the defendant.

"There is no rule of law that a minor may not be employed about a dangerous machine, and the simple fact that a machine is dangerous does not make an employer liable for an injury received by a minor employed upon such machine. All the law requires is that the minor should be properly instructed as to the danger to which he is exposed, and if he is injured because he has not received such instruction, then as a general rule the employer may be held responsible. But where the minor is familiar with the machine, and its character and operation are obvious, and he is aware of and fully appreciates the dangers to be apprehended from working the machine, the fact that he is a minor does not alter the general rule that the employee takes upon himself the risks which are patent and incident to the employment." *Buckley* v. *Guttapercha Rubber Mfg. Co.,* 113 N. Y. 540, 21 N. E. 717.

The opinion of the court in that case quotes from the opinion in *Hickey* v. *Taaffe,* 105 N. Y. 26, 12 N. E. 286, where the injury sued for was sustained by a young girl fourteen years of age, as follows: "She had not, it is true, received any instructions as to its dangers from the defendant or his agents, as she says; but she had acquired the information, in fact, from the best of all teachers, that of practical experience. She knew therefore all that the instructions of the defendant would have imparted to her. This was enough. Being of an age to appreciate, and having full knowledge of the danger, and at the same time being competent to perform the duty demanded from her, the fact that she was a minor does not alter the general rule of law upon the subject of employees taking upon them the risks that are patent and incident to the employment."

In the case here, the evidence is that not only Cochran, the motorman, under whom the deceased worked, did instruct him to ride on the rear of the "trip," but one of the other motormen, under whom he worked, testifies that he instructed him to be careful; so that whether he was injured while attempting to mount the cars next to the motor, or the motor, or while attempting to mount the rear car, the accident could not possibly be attributed to a failure to give him instructions that would have added to the knowledge he already possessed as to the dangers of the work he was doing.

The evidence plainly shows also that neither the deceased nor anyone else who knew him and the service he was performing for one moment supposed that he was not capable of performing the service, or that he did not fully appreciate any dangers attendant upon the performance thereof. It is also not denied by the father, who is the beneficiary and real plaintiff in the case, but in fact admitted, that he consented to deceased's employment by the defendant as brakeman or flagman upon the trips of cars carried in and out of defendant's mine, and that he (the father and plaintiff here) received regularly the benefit of the wages of the deceased as such brakeman or flagman, and furthermore that deceased had several times taken the father's place in the defendant's mines when he was off planting his crop or doing other work. Be that, however, as it may, there could be no recovery of the defendant in this action unless the evidence proved that it was guilty of some negligence which was the sole proximate cause of the accident to plaintiff's intestate.

A master's duty is to use ordinary care to provide a reasonably safe place in which his servant is to work, considering the character of the work in which the servant is engaged, and he is liable for injuries to his servant resulting from his failure to exercise such care; but as absolute safety is unattainable, employers are not held to be insurers, and can only be held liable in damages for an injury to an employee where the negli-

gence of the employer is averred as the basis of the action and is established by proof. *So. Ry. Co.* v. *Lewis,* 113 Va. 117, 73 S. E. 469; *Va. I. C. & C. Co.* v. *Kiser, supra.*

Where there is a demurrer to the evidence, if the evidence is such that a jury might have found a verdict for the demurree, the court must so find, and grant judgment in his favor, but it is equally well-settled law that it is incumbent upon the plaintiff in an action to recover damages for an injury alleged to have been caused by the carelessness or fault of the defendant or his agent, to furnish evidence to show how and why the accident occurred—some fact or facts by which it can be determined by the jury, and not left to conjecture, guess or random judgment, upon mere supposition, without a single known fact. Authorities cited, *supra,* and *N. & W. Ry. Co.* v. *McDonald,* 106 Va. 207, 55 S. E. 554, and cases there cited.

We deem it unnecessary to review the evidence in this case further. As we view it, under the rule adverted to, the evidence and the inferences which might have been drawn from it are wholly insufficient to have warranted the jury in finding that the defendant was guilty of negligence, and that such negligence caused the death of plaintiff's intestate, without fault on his part; but, in fact, the evidence proves no more than that the occurrence, resulting in the injury and death of plaintiff's intestate, was an accident which is wholly unaccounted for or explained by the evidence, and for which the defendant company could not, either in law or justice, be held responsible. If he had gotten on the motor, when he was apparently safe, as Cochran, the motorman, testified, and then slipped off the motor and his foot had been caught in the switch point, which would seem clearly to have been impossible, in view of the physical facts as to the situation surrounding the occurrence, the catching of his foot in the switch point under such circumstances, and as to which there is no proof, would not have been proximate cause of the accident, but

would have been an accident, pure and simple, the cause of which the defendant could not reasonably have been expected to foresee and provide against.

In the brief of counsel for the plaintiff it is argued that the defendant was guilty of actionable negligence, proximately causing the injury to the deceased by reason of its not having complied with the requirements of section 27 of the mining act, *supra,* which provides that "there shall be adopted by the operator of every mine in this State, special rules for the government of every mine or mines, covering all the work pertaining thereto, in and outside of the same;" and, in substance, the contentions made by counsel in their brief are (1) that there should have been some peremptory rule made by the defendant company requiring plaintiff's intestate to catch the rear of all "trips," and holding the motorman responsible for allowing brakemen to catch "trips" between the cars; and (2) a rule requiring all motormen to ascertain certainly by definite signal that a brakeman attempting to catch a moving trip, had succeeded in doing so.

Recognizing, doubtless, the established rule that the plaintiff cannot recover on a case not made by the pleadings, the argument of counsel here is that said rule is modified in this case by the fact that certain evidence, which they do not point out, was admitted without objection on the part of the defendant, and the case of *Newberry* v. *Watts,* 116 Va. 730, 82 S. E. 703, is relied on as supporting counsel's contention.

In that case it is held that if a litigant sits by and permits evidence to go to the jury which the court, if it had been objected to, would have excluded, the jury has the right to consider it along with the other evidence, and give it such weight as they think it is entitled to, but that ruling cannot be construed as meaning that evidence can be considered which has no bearing upon any fact in issue. In that case, secondary evidence was admitted and was not objected to, but it had some bearing on the issue in the case, and for that reason could be

considered by the jury. Our law is that negligence must be averred. and proved as averred, and this court went as far in the case of *Newberry* v. *Watts, supra,* as it is inclined to go or has ever gone in the direction of impairing this plain rule by giving assent here and there to the proposition that whenever evidence is introduced in the court below without objection, that admission is to be taken as an enlargement of the scope of the pleadings. The rule has never been carried in any case decided by this court to the extent contended for by counsel in the case at bar.    .

The only evidence to which counsel for the plaintiff could have referred in their brief to sustain their contention is that appearing in the testimony given by plaintiff's witness, Raymond Jones, the sum and substance of which is that he had never seen any rule of the defendant company prescribing where the brakeman should get on the cars. This evidence it appears was brought out incidentally when the witness was being interrogated as to what warning and instructions the deceased had in the discharge of his duties, and could not have been, as would seem clear, objected to. Not only so, but, as counsel for the defendant contend, the legislature in requiring operators of mines in this State to adopt special rules for the government and operation of the same, covering all the work pertaining thereto, did not intend that such rules should be adopted in reference to everything done inside and outside of the mines, and certainly did not intend to require mining companies to make and promulgate rules relating to the ordinary details of a business or employment in which the plaintiff's intestate was. engaged, involving work of a simple character and well understood by him.

Upon the whole case we are of opinion, without passing upon other questions raised, that the judgment of the circuit court overruling, the demurrer of the defendant to the evidence should be reversed, and this court will enter the judgment the circuit court should have rendered.

*Reversed.*