# Wytheville

M. S. HAWKINS AND L. H. WINDHOLTZ, RECEIVERS, ETC. V.
CHARLES L. EASON, ADMINISTRATOR, ETC.

June 13, 1935.

Present, All the Justices.

The opinion states the case.

*James G. Martin,* for the plaintiffs in error.

*Foreman, Pender & Dyer, Charles L. Eason* and *Q. C. Davis, Jr.,* for the defendant in error.

GREGORY, J., delivered the opinion of the court.

Charles L. Eason, administrator of Walter Griffin, deceased, brought an action for damages for the death of Griffin against N. W. Wallace and C. R. Wallace, and Hawkins and Windholtz, the two last named being the receivers

of the Norfolk Southern Railway Company. The case was tried by a jury and at the conclusion of the evidence the court struck out the evidence as to N. W. Wallace and C. R. Wallace. The liability of the receivers was submitted to the jury under instructions of the court with the result that they found in favor of the plaintiff against the receivers for the sum of $2,500. Judgment was entered on the verdict and we are here reviewing the said judgment.

The facts in the case material to our decision may be stated thus: Walter Griffin, a young colored man, was killed by the electric train operated by the servants of the receivers at a grade crossing in the city of Norfolk where Princess Anne road crosses over the tracks of the Norfolk Southern Railroad Company. On the 24th day of March, 1934, about 4:30 o'clock in the afternoon Walter Griffin was riding on the running board of a large truck which was owned by C. R. Wallace and at the time was being driven by N. W. Wallace and bound into the city. Griffin was standing on the running board on the right hand side of said truck and on the side from which the train was approaching. The train was in plain view of the operator of the truck as well as Griffin. The electric engine pulling nine freight cars was approaching the said grade crossing. The bell on the engine was ringing and the other crossing signals had been given. It approached the crossing very slowly. A brakeman was standing in the left door of the engine and he said to the motorman "hold her, hold her." At this time the motorman said that he already had his brakes on preparing to slow down for the crossing and immediately afterwards in response to the brakeman's request he slowed down to about two miles an hour. The brakeman had given these instructions to the motorman because he had seen the large truck approaching the crossing at a rapid speed. Some of the witnesses estimated the speed of the truck at forty-five miles an hour while others estimated the speed from fifteen to thirty-five or forty miles per hour.

The truck passed safely over the tracks just in front of the engine. The motorman said that the driver of the truck

"had to sheer a little bit; afraid I would hit him." As the truck passed over the tracks the motorman gave the engine more power, not knowing that any one had alighted from the truck and when the engine reached the crossing it had increased its speed to about eight miles per hour.

As the truck approached the track, Griffin jumped from the running board and landed at a point thirty-six feet from the track and as he landed he fell to one knee, recovered his balance and continued in the direction the truck was going and just as he reached the track upon which the train was approaching he fell and before he could gain his feet the train ran upon him and killed him. The motorman never saw Griffin prior to his death, because it was impossible for him to do so from his seat in the cab of the engine. As the engine pulled across the avenue, the motorman said "that he felt something bump under the end of the train" and stopped the train and found that the accident had taken place.

According to the testimony of witness, White, who had pulled up on the other side of the crossing to wait for the train to pass, he saw the train and heard the bell and whistle and stopped his automobile. He said that the truck was running at a speed of approximately thirty-five miles per hour and that it did not slow up for the crossing; that the truck began to sway out in the center of the road; that he saw Griffin jump from the truck; that snow was on the ground and that he slipped on one knee, "righted" himself to some extent and fell in the center of the track where the train hit him. He stated that Griffin was in motion from the time he jumped off of the truck until the train hit him.

It appeared that Griffin was riding on the truck as a guest and that he could have ridden on the inside of the truck rather than on the running board had he so desired.

The court was of the view that there was no liability on the driver and owner of the truck and dismissed them from the proceeding upon their motion.

The court, however, was of the opinion that there was sufficient evidence upon which to submit to the jury the lia-

bility of the receivers upon the doctrine of the last clear chance and upon that doctrine the case was submitted under proper instructions with the result that we have already indicated.

The sole issue raised by the various assignments of error is whether or not there was sufficient evidence to carry the case to the jury on the doctrine of the last clear chance.

The negligence of the truck driver in driving across the railroad tracks at a reckless rate of speed and in such close proximity to the approaching train has been clearly established. Likewise, the negligence of Griffin in jumping off of the fast moving truck at the time, place and under the surrounding circumstances then existing was also clearly established. But for the invocation of the doctrine of the last clear chance we would say that the negligence of Griffin would prevent any recovery for his estate. When that doctrine was interposed it became necessary to look beyond the negligence of Griffin and ascertain if the operators of the train were guilty of any negligence at all. So far as the evidence is concerned the administrator of Griffin points to the testimony of the brakeman Cartwright, who was standing in the left door of the motor engine. He relies almost entirely upon this evidence to establish the fact that the operator of the motor engine had a last clear chance to avoid striking Griffin. It is contended that when Cartwright saw Griffin jump from the running board of the truck and run towards the track he should have told the motorman and the latter should have stopped the train which he said could have been done in two feet, and thereby avoid the accident.

It is necessary to refer to the testimony of Cartwright. To us it is clear and reasonable. He said that he saw the truck approaching the crossing rapidly; that he told the motorman to "hold her," meaning to apply the brakes; that the brakes were applied and the speed of the train reduced to two miles per hour; that at this time he saw Griffin riding on the right running board of the truck; that he told the motorman "to hold her" because he was afraid that unless the speed of the train was reduced it would

collide with the truck for at that time Griffin was still on the truck. Cartwright also stated that he saw Griffin jump from the truck when he was thirty-six feet from the track; that he ran with the truck when he alighted; that he was "slowing down" and appeared to "check himself" and was turning as he approached the tracks and that he (Cartwright) did not look at Griffin again after he had gotten within twenty feet of the track, nor warn the motorman of Griffin's nearness to the train because he thought Griffin was safe, and further because he was looking at the truck which was crossing the tracks at thirty-five miles an hour, just in front of the engine. He said: "The man appeared to me as though he was going to check himself at that distance away (twenty feet) from the track, and nobody would think he was going under the train."

The occupants of the truck testified that when they crossed the tracks the train was forty or fifty feet away and moving slowly. They also said that the truck was traveling across the tracks at fifteen miles per hour and that the train was in full view. If the truck passed over the tracks when the train was forty or fifty feet away and moving slowly it is inconceivable that Griffin could have been killed in the manner described in the evidence.

When we look for the evidence of the negligence of the employees of the receivers, the testimony of the brakeman, Cartwright, that he saw Griffin jump from the truck and run towards the tracks and that he, Cartwright, did not direct the motorman to stop the train, is all of the testimony that has any bearing. In our judgment it does not establish actionable negligence. But even if the employees of the receivers were guilty of negligence, the concurring negligence of Griffin in jumping off of the truck under the circumstances shown to exist would prevent any recovery in this case.

The doctrine of the last clear chance has no application. The operators of the train could not have been expected to foresee that Griffin would jump from the truck and run in front of the train. It was not to be reasonably anticipated

that such an extraordinary thing would happen. The operators of the train were not bound to provide against the occurrence of this unusual and exceptional conduct on the part of Griffin.

In the case of *W. & O. D. Ry.* v. *Weakley*, 140 Va. 796, 125 S. E. 672, 676, this court speaking through Judge Christian said: "In the case of the *Virginia Iron C. & C. Co.* v. *Hughes' Adm'r*, 118 Va. 731, 741, 88 S. E. 88, 92, the Supreme Court of Appeals of Virginia held the following as established law in this State: 'It is not negligence to fail to take precautionary measure to prevent an injury, which if taken would have prevented it, and when the injury could not reasonably have been anticipated and would not have happened but for the occurrence of exceptional circumstances * * *. The first requisite of proximate cause is the doing or omitting to do an act which a person of ordinary prudence could foresee might naturally or probably produce the injury, and the second requisite is that it did produce it.' *Va. I., C. & C. Co.* v. *Kiser, Adm'r*, 105 Va. [695] 704, 54 S. E. 889, and authorities cited; *N. & W. Ry. Co.* v. *McDonald's Adm'x*, 106 Va. 207, 55 S. E. 554; *Recker* v. *Southern Ry. Co.*, 115 Va. 201, 78 S. E. 580. The same principle of law applies to negligence where a person is doing a lawful act. The injury by omission of precaution must have reasonably been anticipated, and must naturally or probably have contributed to the injury."

Mr. Justice Holt, in a well considered opinion in the case of *Wyatt* v. *Telephone Co.*, 158 Va. 470, 163 S. E. 370, 373, 82 A. L. R. 386, after reviewing a great many of the cases both within and outside of this jurisdiction, concludes with this significant statement: "The substance of it all, stated and restated in various ways, is that negligence carries with it liability for consequences which, in the light of attendant circumstances, could reasonably have been anticipated by a prudent man, but not for casualties which, though possible, were wholly improbable. One is not charged with foreseeing that which could not be expected to happen." That principle applies here.

No cross-error is assigned to ₁the action of the court in striking out all of the evidence regarding an ordinance of the city of Norfolk requiring safety gates at this crossing when required by the director of public safety. For this reason we cannot consider the action of the court. But the absence of safety gates could not excuse the gross negligence of Griffin in jumping from the truck and running in front of the train. If the court had permitted this evidence it could not have changed the result. Griffin's death was the result of his own negligence or the concurring negligence of the trainmen and himself. In either event there could be no recovery.

The judgment is reversed and the verdict set aside. Final judgment is now awarded in favor of the receivers.

*Reversed.*